# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MARVIN BURTON, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civil Action No. 11-1151-GMS |
| | ) | |
| DAVID PIERCE, Warden, and | ) | |
| ATTORNEY GENERAL OF | ) | |
| THE STATE OF DELAWARE, | ) | |
| | ) | |
| Respondents. | ) | |

Mark S. Greenberg.  Counsel for petitioner.

Elizabeth R. McFarlan, Delaware Department of Justice, Wilmington, Delaware.  Counsel for respondents.

## MEMORANDUM OPINION

_____*March 30*_____, 2017
Wilmington, Delaware



Sleet, District Judge

Pending before the court is a petition and a supplemental petition for a writ of habeas

corpus pursuant to 28 U.S.C. § 2254 ("petition") filed by petitioner Marvin Burton ("Burton").

(D.I. 1; D.I. 10; D.I. 23) The State filed an answer in opposition. (D.I. 24) For the reasons

discussed, the court will deny the petition.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.  The Facts[1]

> C.B. was 11-years-old when Burton sexually abused her. Burton is her father. Kesha Davis is her mother. Burton and Kesha were involved in a romantic relationship in 1992 when they were 25 and 16, respectively. He ended the relationship after Kesha became pregnant with C.B. Several years later Burton was convicted of two counts of Unlawful Sexual Intercourse in the Third Degree and sentenced to serve four and one-half years in prison. The victim was a 13-year-old girl. C.B. had no contact with Burton until after he was released from prison in January 2004. Vivian Burton did not know that C.B. was her granddaughter until after Burton was released from prison. Burton and Kesha resumed their relationship soon after he was released from prison.

> Burton moved into a trailer behind his parents' house on their property after he was released from prison. The trailer was used primarily for storage and had only one bedroom. It did not have running water or air-conditioning. Kesha moved into the trailer with Burton. C.B. moved into Burton's parents' house. Kesha and her three children had been staying with Kesha's aunt, Sharon Hernandez. When Kesha and C.B. moved to Burton's parents' property, Kesha's other two children, A and Z, remained with Sharon until they moved in with their father[2] in May 2004. Burton and Kesha did not spend nights in the house. They stayed in the trailer. C.B. did not spend nights in the trailer. She stayed in the house. C.B. spent some nights with her other relatives that summer, primarily those who had children her age.

> Vivian Burton worked part-time cleaning houses one or two days a week. Marvin

---

[1]The background and trial facts have been taken verbatim from the Delaware Superior Court's recitation in *State v. Burton*, 2010 WL 3946275, at *1-4 (Del. Super. Ct. Sept. 30, 2010). Initials have been substituted for the names of the minor victim and her siblings.

[2]Burton is not the father of A and Z.

Burton, Sr. worked full-time at Kent-Sussex Industries. They both left in the morning for work. Thus, there were times when Vivian and Marvin Burton, Sr. were not at their home. Burton worked for a contractor who was renovating a school during the day and a cleaning service at night. His construction job eventually ended, leaving him only with the night job. Kesha cut hair during the day and also worked at the cleaning service at night.

Burton was convicted of improperly touching C.B.'s breasts with his hands and her buttocks with his penis and raping her vaginally with his fingers and penis. His sexual abuse of C.B. escalated quickly over a short period of time. The improper sexual contact occurred one evening in Burton's parents' house at the end of the school year, possibly in May or June. C.B., Kesha and Burton were in the house. C.B. and Burton were in the hallway near the bathroom. Kesha was in the living room. Burton touched C.B.'s breasts and hugged her so forcefully from behind that she could feel his penis rubbing against her buttocks through her clothing. When Kesha left the living room to check on C.B., she saw Burton hugging C.B. from behind. Burton moved away from C.B. after Kesha saw him.

The rapes occurred in the morning at Burton's parents' house in August. The first rape occurred while C.B. was asleep in her bed. She woke up when Burton put his fingers in her vagina. This happened while Vivian Burton and Kesha were at work. C.B. and Burton were alone in the house that day. The second rape occurred after C.B. had gotten out of bed and was getting ready to take a shower. Burton came into her room, pushed her onto the bed, removed her pajamas, got on top of her and put his penis in her vagina. Burton stopped after about five minutes and left the room. This also happened while Vivian Burton and Kesha were at work. C.B. did not tell anyone about Burton raping her because he told her that he would get in trouble and go to jail and she would be sent away.

Burton and Kesha got married on September 1, 2004. However, their marriage quickly unraveled. Burton, who was a pastor of sorts, started calling and visiting his ex-wife regularly and counseling a teenage girl on the phone. Kesha got tired of this and moved to North Carolina with C.B. and her other children around the middle of September. She and her children returned to Delaware to attend her brother's birthday party in October. During the trip home, Kesha asked C.B. if she wanted to see Burton while they were in Delaware. C.B. became upset and told Kesha about some of the things that Burton had done to her. This prompted Kesha to arrange a three-way cell phone call between C.B., Burton and Rhonda Street, her cousin. She had Rhonda listen in on the conversation between C.B. and Burton. Burton did not know that Rhonda was listening in on his conversation with C.B. He made a number of incriminating statements during the conversation that Rhonda heard, including telling C.B. that she needed to change her story about him touching her. This led to an investigation by the police, more disclosures by C.B., the charges against Burton, and his trial.

2

## B. The Trial

The State's case against Burton rested largely on the testimony of C.B., Kesha, Rhonda, Karen Smail and Christopher Judge. C.B. testified about Burton touching her breasts with his fingers and her buttocks with his penis and placing his fingers and penis in her vagina at his parents' house. Kesha testified about seeing Burton "grinding" against C.B. at his parents' house. C.B., Kesha and Rhonda testified about the three-way phone conversation with Burton where he made incriminating statements about sexually assaulting C.B. Karen Smail is the nurse who examined C.B. She testified that C.B.'s hymen was broken and that the results of her examination led her to believe that C.B. had engaged in sexual activity. Christopher Judge is a records custodian for Verizon Wireless. His testimony linked the cell phone numbers belonging to Kesha, Burton and Rhonda to a three-way cell phone call on October 2, 2004.

Burton's defense was that he was never alone with C.B. at his parents' house, that C.B. had recanted her allegations of sexual abuse, and that C.B. had spent some time with her other relatives that summer. His defense rested on the testimony of Vivian Burton, Stacie Brittingham, Katrina Morris and Tionyell Cannon. Burton used Vivian Burton's testimony to attack the two rape charges by attempting to show that he was never alone with C.B. at his parents' house. Vivian Burton testified about C.B.'s living arrangements while C.B. was at her house. C.B. was never alone with Burton in her house the entire summer. She would be with both Burton and Kesha. If Vivian Burton left the house, C.B. would not be left alone in the house by herself. She would be either with her mother or at a relative's house according to Vivian Burton.

Burton used Stacie Brittingham's testimony to attack the unlawful sexual contact charge by attempting to show that C.B. had said that it did not happen. Stacie testified about a conversation she had with C.B. about the "grinding incident." She has two children, Tiara and Melvin. C.B. attended Tiara's birthday party and spent the night at Stacie's house on Saturday, August 21, 2004. Kesha picked up C.B. the next day. However, according to Stacie, before C.B. left, Stacie and Kesha talked about the "grinding incident" in the hallway at Vivian Burton's house. Stacie testified that she asked C.B. if this happened. C.B. said that it did not according to Stacie. Kesha testified at the trial that C.B., when asked by Stacie if anything had happened with Burton, said that it did not. C.B. admitted at the trial that she told Stacie and Kesha that Burton did not do anything to her, but she added that her denial was not true. She did not tell Kesha and Stacie the truth because she thought her siblings, which [*sic*] she had just gotten to know, would be mad at her if she got Burton, their father, in trouble.

Burton used the testimony of Katrina Morris and Tionyell Cannon to show that C.B. had spent some time with them that summer. Katrina Morris testified about C.B. spending some time with her and her husband, Eric Morris, at their house in

3

the summer. They have four children and live approximately one-quarter of a mile away from Burton's parents' house. C.B. used to come and "stay the night" with Katrina and Eric all the time during the summer of 2004. C.B. had sleep-overs with Katrina's oldest daughter, Erica. During the Summer of 2004, from the time school got out in June until it started back in September, C.B. spent "four or five nights straight" either the weekend before or after the 4th of July, and then three or four times after that "she spent a night or two" according to Katrina.

Tionyell Cannon testified about C.B. spending time with her. She has three children, one of which, Jaquesha Burton, was fathered by Burton. Tionyell has never been married to Burton. C.B. "spent the night" with her "maybe about six to ten times" during the Summer of 2004.

However, none of Burton's witnesses testified that C.B. had moved out of his parents' house in July and was not living there in August and September.

*Burton*, 2010 WL 3946275, at *1-4.

### C. Procedural Background

In August 2005, a Delaware Superior Court jury convicted Burton on one count each of first degree rape (victim under the age of 12), second degree rape (victim under the age of 12), and second degree unlawful sexual contact. The Superior Court sentenced him as a habitual offender to two life sentences plus two years at Level V incarceration. (D.I. 24 at 1) Burton appealed, and his appellate counsel moved to withdraw after finding no arguable meritorious claims for relief to present to the court. *See Burton v. State*, 907 A.2d 145 (Table), 2006 WL 2434914, at *1 (Del. Aug. 21, 2006). The Delaware Supreme Court informed Burton he could present any issues he wished to include for presentation to the court, but he elected not to do so. *Id.* The Delaware Supreme Court affirmed Burton's convictions and sentences. *Id.*

On August 16, 2007, Burton filed his first *pro se* motion for postconviction relief pursuant to Delaware Superior Court Criminal Rule 61 ("Rule 61 motion"). The Superior Court denied the Rule 61 motion. *See State v. Burton*, 2008 WL 2359717 (Del. Super. Ct. June 3, 2008). Burton appealed in June 2008, and then subsequently attempted to supplement the record

4

with various affidavits. Because the trial court had not considered the new evidence in the first instance, the Delaware Supreme Court remanded the case to the Superior Court to allow that court to consider Burton's new evidence. *See Burton v. State*, 968 A.2d 491 (Table), 2009 WL 537194 (Del. Mar. 4, 2009). On remand, the Superior Court granted Burton's request for an evidentiary hearing. *See Burton*, 2010 WL 3946275. After the evidentiary hearing was held in 2009, but before the Superior Court issued its decision, the State provided Burton with a DVD of C.B. recanting her testimony. (D.I. 10 at 7) The DVD was generated in January 2010 by the Child Advocacy Center ("CAC") in connection with an interview of C.B. regarding her status as a foster child. *Id.* In this video, C.B. told the interviewer that her accusations against Burton were a "fraud." *Id.* On March 5, 2010, Burton filed a motion to re-open the record in the Superior Court, alleging that the DVD constituted evidence of Burton's actual innocence and that the DVD also supported his ineffective assistance of counsel claim. (D.I. 21-10 at 30, Entry No. 143) The Superior Court docket reflects that the Superior Court planned to schedule a hearing regarding the recantation. (D.I. 21-10 at 30, Entry No. 144) Instead, however, the Superior Court held an office conference on this issue on June 15, 2010. (D.I. 21-10 at 30, Entry No. 154)

On June 18, 2010, the Superior Court denied the motion to reopen, explaining that the scope of the Delaware Supreme Court's remand "is clearly limited to consideration of whether the three new statements [in the affidavits] would have affected my decision on Mr. Burton's claim of ineffective assistance of counsel. Therefore, I will consider the record closed and will issue a written decision on the record before me." (D.I. 21-10 at 31, Entry No. 155) After considering the 2009 evidentiary hearing testimony and subsequent briefing, the Superior Court denied Burton's Rule 61 motion in its entirety on September 30, 2010. *See Burton*, 2010 WL

5

3946275. Burton appealed, and the Delaware Supreme Court affirmed that decision. *See Burton v. State*, 29 A.3d 245 (Table), 2011 WL 4342636 (Del. Sept. 15, 2011).

Represented by counsel, Burton timely filed a federal habeas petition in November 2011. (D.I. 1) In June 2012, Burton moved, with the consent of the State, to stay the habeas proceeding to allow him to exhaust one of his claims. (D.I. 16) The court granted the motion to stay. (D.I. 17)

In June 2012, C.B. pled guilty to first degree assault and possession of a deadly weapon during the commission of a felony, based on an incident in which C.B. stabbed another woman for talking to C.B.'s son's father. *See State v. Burton*, 2014 WL 5468874, at *5 (Del. Super. Ct. Aug. 27, 2014). During the pre-sentence investigation in that case, C.B. informed the investigator that she was under pressure from Burton's family to recant her claim that he had raped her. *Id.* The Superior Court sentenced C.B. to eight years at Level V incarceration. (D.I. 23 at 3)

On May 2, 2013, Burton filed a second Rule 61 motion, this time represented by counsel. The second Rule 61 motion alleged that his convictions should be vacated and a new trial ordered because of C.B.'s 2010 recantation to the CAC. (D.I. 23 at 4) The Superior Court scheduled an evidentiary hearing for August 2013. However, shortly before the originally scheduled postconviction evidentiary hearing in Burton's second Rule 61 proceeding, C.B. informed the state prosecutor that Burton did not have sex with her. *See State v. Burton*, 2014 WL 5468874, at *3. During a subsequent telephone conference with the judge presiding over Burton's second Rule 61 proceeding, the same prosecutor asked the judge to appoint C.B. counsel because he was considering indicting her for perjury if she persisted in her recantation disavowing her 2005 trial court testimony that Burton had raped and sexually assaulted her. The

6

Superior Court appointed counsel to represent C.B.  (D.I. 23 at 4-5)  The Superior Court postponed and re-scheduled the evidentiary hearing for November 2013, and then re-scheduled it again for January 2014.  (D.I. 24 at 2-3)  C.B. testified during the January 2014 evidentiary hearing.

The Superior Court denied Burton's second Rule 61 motion on August 28, 2014. *See Burton,* 2014 WL 5468874, at *6.  In reaching this decision, the Superior Court determined that C.B.'s recantation was not credible, because it was the result of pressure from Burton's family and C.B.'s belief that Burton had served enough time.  *Id.* at *6.  The Superior Court also found that C.B.'s foster mother arranged for her to go to the Child Advocacy Center ("CAC") in 2010 so that she could recant.  *Id.* at *2.  The court explained that C.B. "is just not a credible witness at this time" and would say "whatever best suits her needs or concerns at the time."  *Id.* at *6.

Burton appealed the denial of his second Rule 61 motion.  In November 2014, while his appeal was pending, C.B. wrote a letter to the state prosecutor in Burton's case, asserting that he and his team had led her to believe that with her testimony at the January 2014 hearing in Burton's second Rule 61 proceeding she would be eligible for some type of relief for her own conviction ("tacit agreement").[3]  (D.I. 23 at 7)  The letter was forwarded to Burton's counsel, who then forwarded the letter to the Delaware Supreme Court requesting a remand to the Superior Court so that the Superior Court could review C.B.'s allegation.  (D.I. 23 at 7)  The Delaware Supreme Court remanded the case to the Superior Court for further proceedings on the issue.  The Superior Court held evidentiary hearings in August and September 2015 on whether

---

[3]In 2012, C.B. was sentenced to eight years of incarceration for stabbing a woman who was talking to the father of C.B.'s son.  In April 2014, approximately four months after the January 2014 evidentiary hearing in Burtons' second Rule 61 proceeding, C.B. filed a motion for modification of sentence.  Her sentence was reduced to six years of incarceration.

there had been a tacit agreement between C.B. and the State. *See State v. Burton,* 2015 WL

6735833 (Del. Super. Ct. Oct. 28, 2015).  On October 28, 2015, the Superior Court issued factual

findings that "the State made no representations to the victim's counsel regarding the victim's

request for postconviction relief in exchange for the victim's testimony at Marvin Burton's

January 27, 2014, evidentiary hearing." *Id.* at *3.

Upon return of the appeal, the Delaware Supreme Court affirmed the Superior Court's

denial of Burtons' second Rule 61 motion.  In so doing, the Delaware Supreme Court explicitly

stated that the Superior Court's findings of fact were "supported by the evidence," and gave the

factual findings "deference on appeal." *Burton v. State*, 146 A.3d 64 (Table), 2016 WL

3568189, at *1-2 (Del. June 22, 2016).

In July 2016, upon the parties' joint request (D.I. 18), the court lifted the stay in this case.

Burton filed a supplemental petition (D.I. 23), and the State filed an answer in opposition.  (D.I.

24)

## II.    GOVERNING LEGAL PRINCIPLES

### A.  The Antiterrorism and Effective Death Penalty Act of 1996

Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")

"to reduce delays in the execution of state and federal criminal sentences . . . and to further the

principles of comity, finality, and federalism." *Woodford v. Garceau*, 538 U.S. 202, 206 (2003).

Pursuant to AEDPA, a federal court may consider a habeas petition filed by a state prisoner only

"on the ground that he is in custody in violation of the Constitution or laws or treaties of the

United States." 28 U.S.C. § 2254(a).  AEDPA imposes procedural requirements and standards

for analyzing the merits of a habeas petition in order to "prevent federal habeas 'retrials' and to

ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

## B. Standard of Review

When a state's highest court has adjudicated a federal habeas claim on the merits, the federal court must review the claim under the deferential standard contained in 28 U.S.C. § 2254(d).[4] Pursuant to 28 U.S.C. § 2254(d), federal habeas relief may only be granted if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or the state court's decision was an unreasonable determination of the facts based on the evidence adduced in the trial. 28 U.S.C. § 2254(d)(1) & (2); *see Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001). This deferential standard of § 2254(d) applies even "when a state court's order is unaccompanied by an opinion explaining the reasons relief has been denied." *Harrington v. Richter*, 562 U.S. 86, 98-100 (2011). As explained by the Supreme Court, "it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Id.*

Finally, when reviewing a claim under § 2254(d), a federal court must presume that the state court's determinations of factual issues are correct. *See* 28 U.S.C. § 2254(e)(1); *Appel*, 250 F.3d at 210. This presumption of correctness applies to both explicit and implicit findings of fact, and is only rebutted by clear and convincing evidence to the contrary. *See* 28 U.S.C.

---

[4]A claim has been "adjudicated on the merits" for the purposes of 28 U.S.C. § 2254(d) if the state court decision finally resolves the claim on the basis of its substance, rather than on a procedural or some other ground. *See Thomas v. Horn*, 570 F.3d 105, 115 (3d Cir. 2009).

§ 2254(e)(1); *Campbell v. Vaughn*, 209 F.3d 280, 286 (3d Cir. 2000). The Supreme Court has "not defined the precise relationship between § 2254(d)(2) and § 2254(e)(1)." *Burt v. Titlow*, 134 S.Ct. 10, 15 (2013); *but see Miller-El v. Cockrell*, 537 U.S. 322, 341 (2003)(stating that the clear and convincing standard in § 2254(e)(1) applies to factual issues, whereas the unreasonable application standard of § 2254(d)(2) applies to factual decisions).

## III.   DISCUSSION

Burton's original petition for federal habeas relief raises two claims for relief: (1) defense counsel provided ineffective assistance by failing to "properly and thoroughly interview, question and call witnesses who would have testified that the complainant did not live at the home of her grandparents at the time the sexual assaults allegedly occurred, in direct contradiction to her trial testimony" (D.I. 10 at 7); and (2) the Superior Court denied Burton his right to due process in his first Rule 61 proceeding by refusing to reopen the record and consider C.B.'s 2010 video-taped recantation before rendering its decision. (D.I. 1 at 9) In his supplement to the original petition, Burton raises a third claim: he was denied due process when the State promised C.B. and her appointed counsel that the State would help with C.B.'s eight year sentence if she disavowed her 2010 recantation and testified at the January 2014 evidentiary hearing that Burton had raped and sexually assaulted her. (D.I. 23 at 14)

### A.  Claim One:  Ineffective Assistance of Counsel

In claim one, Burton contends that defense counsel provided ineffective assistance by failing to adequately interview witnesses who could have testified that C.B. was not living at Burton's parents' house during the time of the alleged rapes. Burton presented this argument in his first Rule 61 motion, and the Superior Court denied it as meritless. The Delaware Supreme Court affirmed that decision. Therefore, Burton will only be entitled to relief for claim one

10

under § 2254(d)(1) if the Delaware Supreme Court's decision was either contrary to, or an unreasonable application of, clearly established federal law.

The clearly established Supreme Court precedent governing ineffective assistance of counsel claims is the two-pronged standard enunciated by *Strickland v. Washington*, 466 U.S. 668 (1984) and its progeny. *See Wiggins v. Smith*, 539 U.S. 510 (2003). Under the first *Strickland* prong, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness," with reasonableness being judged under professional norms prevailing at the time counsel rendered assistance. *Strickland*, 466 U.S. at 688. Under the second *Strickland* prong, a petitioner must demonstrate "there is a reasonable probability that, but for counsel's error the result would have been different." *Id.* at 694. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Id.*

In order to sustain an ineffective assistance of counsel claim, a petitioner must make concrete allegations of actual prejudice and substantiate them or risk summary dismissal. *See Wells v. Petsock*, 941 F.2d 253, 259-60 (3d Cir. 1991); *Dooley v. Petsock*, 816 F.2d 885, 891-92 (3d Cir. 1987). Although not insurmountable, the *Strickland* standard is highly demanding and leads to a "strong presumption that the representation was professionally reasonable." *Strickland*, 466 U.S. at 689.

When denying claim one, the Delaware Supreme Court correctly identified *Strickland* as the applicable precedent. *See Burton v. State,* 29 A.3d 245 (Table), 2011 WL 4342636, at *1 n.3 (Del. Sept. 15, 2011). As such, the Delaware Supreme Court's decision was not contrary to clearly established federal law.

The court must also determine if the Delaware Supreme Court reasonably applied *Strickland* to the facts of Burton's case. *See Harrington*, 562 U.S. at 105-06. When performing

11

this inquiry, the court must review the Delaware Supreme Court's denial of Burton's ineffective assistance of counsel allegations through a "doubly deferential" lens. *Id.* "[T]he question is not whether counsel's actions were reasonable, [but rather], whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

In this case, Burton was charged by indictment with one count each of first and second degree rape for having penile-vaginal intercourse and for digitally penetrating his then eleven-year-old daughter. The indictment alleged that the rapes occurred between August 1, 2004 and September 15, 2004. During the evidentiary hearing in the first Rule 61 proceeding, defense counsel testified that he presented a three-pronged defense theory at trial: (1) C.B. made up the allegations to retaliate against Burton because she had been caught with other boys; (2) Burton and C.B.'s mother were separating and C.B.'s mother put C.B. up to making these allegations so that Burton would be incarcerated and the mother could keep his property; and (3) the telephone records submitted by Burton proved he was either never alone with C.B., or when he was, he was constantly on the phone with C.B.'s mother and had no opportunity to rape C.B.  (D.I. 21-12 at 20-29, 30-34, 40-41)  Defense counsel testified that he interviewed the witnesses on Burton's list prior to trial, and that none of these witnesses informed him that C.B. had not lived in her grandparents' house during the time-period alleged in the indictment.  Defense counsel explained that he believed Burton had provided this list of potential witnesses to support Burton's defense that C.B. was making up the allegations to get back at Burton after he informed C.B.'s mother about C.B.'s sexual activity with boys.  (D.I. 21-12 at 30)  Finally, defense counsel testified that both Burton and his mother had told him that C.B. had lived in Burton's mother's house during the relevant time-period and that no other witnesses had offered information in their pre-trial

interviews to contradict that fact. (D.I. 21-12 at 39-40); *see also Burton*, 2011 WL 4342636, at

*1.

The Superior Court examined the parties' briefs, the statements and affidavits provided

by Burton, and the testimony at the two-day evidentiary hearing in Burton's first Rule 61

proceeding, and made the following factual determinations:

> I have concluded that Burton's allegation that [C.B.] was not living at this
> parents' house when he allegedly raped her there is not credible.  My decision is
> based on (1) Burton's failure to tell [defense trial] before the trial, and then during
> the trial, that [C.B.] was not living at his parents' house when he allegedly raped
> her there; (2) Vivian and Marvin Burton Sr.'s failure to tell [defense counsel]
> before the trial that [C.B.] was not living at their house when Burton allegedly
> raped her there; (3) conflicts between the trial testimony of Burton's witnesses
> and his allegation that [C.B.] was not living at his parents' house when he
> allegedly raped her there; (4) conflicts between Burton's other defenses and his
> allegation that [C.B.] was not living at his parents' house when he allegedly raped
> her there; (5) Burton's failure to allege that [C.B.] was not living at his parent's
> house when he allegedly raped her there in his pre-trial attacks on her credibility;
> (6) the absence of testimony about where [C.B.] was living in early August 2004;
> (7) the fact that the jury heard [C.B.] offer conflicting testimony about where she
> lived in August and concluded that she lived at Burton's parents' house in
> August; and (8) serious doubts about the credibility of Burton's witnesses and no
> doubts about [defense counsel's] credibility.

*Burton*, 2010 WL 3946275, at *17.  The Delaware Supreme Court affirmed the Superior Court's

judgment on post-conviction appeal after determining "the Superior Court's factual findings to

be supported by competent evidence and not clearly erroneous." *Burton*, 2011 WL 4342636, at

*2.

After reviewing the record, the court concludes that claim one does not warrant relief.

First, the record demonstrates that the Superior Court weighed the credibility of the witnesses

and statements before it, and made detailed factual findings to support those conclusions.  The

allegations in Burton's petition and corresponding affidavits regarding defense counsel's alleged

failure to properly interview the witnesses who could have allegedly supported Burton's

13

contention that C.B. was not living at his parents' house during the relevant time period do not constitute clear and convincing evidence rebutting the Superior Court's detailed factual finding that Burton's assertion regarding C.B.'s place of residence was not credible. Consequently, the court accepts the Superior Court's factual finding as correct.

In turn, since Burton's witnesses at trial placed C.B. in Burton's parents' house at the time he raped her, he cannot demonstrate a reasonable probability that the outcome of his trial would have been different but for defense counsel's alleged inadequate questioning of the potential witnesses on the list Burton provided. *See Burton*, 2010 WL 3946275, at *17. Therefore, the court concludes that the Delaware Supreme Court reasonably applied *Strickland* in holding that defense counsel did not render ineffective assistance with respect to his investigation and questioning of the witnesses identified by Burton. Accordingly, the court will deny claim one.

### B.  Claim Two:  Burton's Due Process Rights Were Violated During First Rule 61 Proceeding

In claim two, Burton contends that his due process rights were violated during his first Rule 61 proceeding when the Superior Court denied his motion to re-open the postconviction record with the 2010 videotaped recantation by C.B. (D.I. 10 at 17)  Burton argues that the DVD would have established his actual innocence and corroborate his ineffective assistance of counsel claim.

The DVD of C.B.'s recantation was generated in January 2010, months after the Delaware Supreme Court remanded the issue back to the Superior Court in March 2009.  The Superior Court denied Burton's motion to reopen the record and supplement his first Rule 61 motion with the DVD in June 2010, explaining that the scope of the Delaware Supreme Court's

remand "is clearly limited to consideration of whether the three new statements [in the affidavits] would have affected my decision on Mr. Burton's claim of ineffective assistance of counsel." (D.I. 21-10 at 31, Entry No. 155) Considering that the DVD did not exist until eight or nine months after the Delaware Supreme Court's remand, the court is perplexed by the Superior Court's reference to the Delaware Supreme Court's remand as somehow preventing it from considering the recantation DVD. Given the tragic and convoluted history of this case, as well as C.B.'s age during this process (she was eleven years old when Burton sexually abused her, twelve years old when she testified during Burton's trial, and seventeen years old when she recanted her trial testimony in the DVD), reviewing C.B.'s recantation DVD would have provided an additional opportunity to protect the integrity of the overall judicial process.[5]

Nevertheless, the court recognizes that its role on habeas review is not "to make its own subjective determination of guilt or innocence." *Herrera v. Collins*, 506 U.S 390, 402 (1993). This court's perception of what it would have done if presented with a similar scenario is also not relevant to the habeas analysis. Additionally, the "federal role in reviewing an application for habeas corpus is limited to evaluating what occurred in the state or federal proceedings that actually led to the petitioner's conviction; what occurred in the petitioner's collateral proceedings does not enter into the habeas calculation." *Hassine v. Zimmerman*, 160 F.3d 941, 954 (3d Cir. 1998). Hence, since Burton's ultimate criticism in claim two is with the Superior Court's analysis in a state collateral proceeding, the court concludes that claim two does not allege an issue cognizable on federal habeas review. *See Lambert v. Blackwell*, 387 F.3d 210, 247 (3d Cir.

_____

[5]It appears that the Superior Court viewed the 2010 DVD during Burton's second Rule 61 motion. The same judge presided over both Rule 61 proceedings.

15

2005)(explaining the "main event" for habeas purposes is the original trial). The court will deny the instant claim for failing to present a proper basis for habeas relief.[6]

### C. Claim Three:  Prosecutorial Misconduct During Burton's Second Rule 61 Proceeding

In his final claim, Burton contends that the Superior Court and the Delaware Supreme Court unreasonably held that the State did not engage in prosecutorial misconduct during his second Rule 61 proceeding. Specifically, he contends that he was denied due process of law because the State "unethically promised C.B. and [her post-conviction counsel] that [it] would help reduce C.B.'s eight year sentence if C.B. disavowed her 2010 recantation and testified at the January 27, 2014 hearing consistent with her trial testimony that [Burton] had raped and sexually assaulted her." (D.I. 23 at 14) According to Burton, the State's "unethical conduct improperly tainted C.B.'s testimony at the recantation hearing and thereby denied [Burton] due process of law." (D.I. 23 at 14) Burton argues that the Delaware state courts made an unreasonable factual determination under § 2254(d)(2) that no prosecutorial misconduct had occurred, and that the state courts' reliance on this unreasonable factual determination resulted in those courts unreasonably applying federal law under § 2254(d)(1) when denying his second Rule 61 motion.

As an initial matter, the court again concludes that this claim is not cognizable on federal habeas review because Burton's ultimate criticism is with the Delaware state courts' analysis in a

---

[6]To the extent Burton is attempting to assert a freestanding claim of actual innocence, it is also unavailing. "Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Herrera v. Collins*, 506 U.S. 390, 400 (1993); *see also McQuiggin v. Perkins*, 133 S.Ct. 1924, 1931 (2013)("We have not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of innocence."). Notably, Burton contends that the alleged due process violation occurred in his state collateral proceeding, not in his underlying state criminal proceeding.

16

state collateral proceeding. Therefore, the court will deny claim three for failing to present a proper basis for habeas relief.

Although the court's determination that claim three is not cognizable provides a sufficient ground to deny the instant claim, given the somewhat tortured history of this case and the severity of Burton's punishment, the court feels compelled to address Burton's contentions that the Delaware state courts unreasonably determined that C.B.'s January 2014 recantation was unreliable and unreasonably determined that there was no tacit agreement between the State and C.B. regarding her January 2014 testimony. A thorough review of the record in this case, as well as a review of the available documents in C.B.'s 2012 criminal proceeding, reveals that there were inconsistencies in C.B.'s story pre-dating the August 2013 meeting between C.B. and the State. For instance, the documents in C.B.'s criminal proceeding demonstrate that she told numerous counselors, as well as the attorney who represented her in her criminal trial, that Burton raped her. During the January 2014 evidentiary hearing in Burton's case, C.B. provided the following testimony:

1. She testified that she voluntarily spoke to the CAC interviewer in 2010, and that she recanted her testimony because she "felt as though it was right at the time, I guess." (D.I. 22-16 at 21) She stated she felt pressured by her foster mother to say it. (D.I. 22-16 at 21) She later explained that she partially told the truth to the CAC interviewer, and when asked what the partial truth was, she stated "that he had sex with me." (D.I. 22-16 at 42)

2. During the morning of the January 2014 hearing, C.B. testified that Burton did not have sex with her. (D.I. 22-16 at 21) When asked later that afternoon, C.B. stated "I don't remember now. I don't remember." (D.I. 22-16 at 43)

3. She denied that she and the State had a discussion about how her testimony at the scheduled January 2014 could affect her sentence. (D.I. 22-16 at 26)

4. She testified that nobody pressured her to give her testimony during the January 2014 hearing. (D.I. 22-9 at 13-14)

17

5.  When asked about what she said to the State during their August 2013 meeting, C.B. acknowledged that she told the State that Burton did not have sex with her. (D.I. 22-16 at 25)  However, when asked if what she told the State was the truth, C.B. said no. When asked why she said it, C.B. said it was because she believed Burton had served enough time for what he did. (D.I. 22-16 at 26)

6.  C.B. testified that, during her August 2013 meeting with the state, she told the prosecutor and the social worker that her biological mother helped her (C.B.) come up with a story to tell at Burton's original trial concerning the frequency and location of Burton's sexual acts with her. (D.I. 22-8 at 46-48)

7.  She admitted that she told various counselors throughout the years that Burton had sexually abused her, and that she could not even keep up with her own lies. (D.I. 22-16 at 48)

Finally, in April 2014, C.B. filed a motion to modify her sentence in her own criminal proceeding. She wrote a letter to the judge, stating that Burton had raped and molested her. *See Burton*, 2014 WL 5468874, at *5. C.B.'s sentence was reduced from eight years to six years.

In August 2014, the Superior Court denied Burton's second Rule 61 motion. Burton appealed, and while his post-conviction appeal was pending, the Delaware Supreme Court was informed about the "tacit agreement" between C.B. and State. The Delaware Supreme Court remanded the matter back to the Superior Court in June 2015, with instructions for it to hold a hearing on the issue of the tacit agreement. (D.I. 23 at 8)  The Superior Court held two hearings: one in August 2015, and one in September 2015. C.B. testified during the August 2015 hearing that her appointed counsel spoke to the State and the judge in her criminal case, and that they "were in agreement to given me my plea that I signed which was four years [] . . . They were willing to give me that if I kept my story the same – my testimony the same that [Burton] raped me. And if I changed my story, I wasn't going to have any relief on my post-conviction." (D.I. 22-13 at 33)  According to C.B., it was her attorney who reached this agreement with the State. (D.I. 22-13 at 35)  During the August 2015 hearing, C.B. testified that the answers she provided

18

during the January 2014 hearing about her conversations with the State in 2013 were not entirely truthful. (D.I. 22-13 at 37)  Finally, both the State and the social worker testified at the August 2015 hearing that the State only told C.B. to tell the truth, and the social worker's notes from that meeting support that testimony. *See Burton*, 2015 WL 6735833, at *5.

Although Burton creatively argues in this proceeding that the State's "unethical pressure explains the multiple inconsistencies that permeated C.B.'s testimony at both the January 31, 2014 and August 31, 2015 hearings," the court is not persuaded that C.B.'s inconsistencies can be attributed to the State's alleged pressure or tacit agreement it made with C.B. in August 2013. As previously explained, C.B. herself admitted that she has told so many lies that she cannot keep her stories straight, including the ones she told to counselors prior to August 2013. In turn, the court's review of available filings in C.B.'s criminal proceedings and filings in Burton's case demonstrate that the inconsistencies in C.B.'s stories began well before August 2013.

Relatedly, the court rejects Burton's assertion that the existence of the tacit agreement caused C.B.'s inconsistent stories and therefore negatively affected the Superior Court's credibility determination.  The January 2014 hearing transcript and a letter from C.B.'s attorney requesting a closed courtroom suggests that the presence of Burton's family members in the courtroom influenced her testimony, rather than any tacit agreement with the State about a possible sentence reduction in C.B.'s case.

Finally, since the Superior Court judge who made the factual findings at issue here presided over both Burton's criminal trial and his Rule 61 proceeding, that particular judge was in the best position to make such credibility determinations.  For all of these reasons, the court cannot conclude that the Delaware state courts unreasonably determined that C.B. was not a credible witness based on the evidence before it.

The court's acceptance of the state courts' determination that C.B. was not credible, along with its conclusion that any tacit agreement between C.B. and the State did not negatively affect C.B.'s January 2014 testimony, essentially obviates the need to address the reasonableness of the Delaware state courts' factual determination that there was no tacit agreement between C.B. and the State. Nevertheless, after reviewing the record, the court cannot conclude that the Delaware state courts unreasonably determined there was a lack of evidence demonstrating the existence of a tacit agreement. The State testified that no agreement existed, C.B.'s attorney described a tacit agreement, and C.B. indicated that her attorney told her she would get leniency if she testified Burton had raped her. The Superior Court found the State's account of the events to be the most believable. When viewed in context of the entire record on this issue, Burton's arguments do not constitute clear and convincing evidence rebutting the Superior Court's factual determination, nor do they demonstrate that the Superior Court's factual determination was based on an unreasonable determination of the evidence before it.

Moreover, the court is not persuaded by Burton's attempt to rebut the Delaware state courts' factual determination with a June 10, 2016 Delaware Supreme Court decision approving the March 23, 2016 report filed by the Delaware Board on Professional Responsibility imposing a thirty-day suspension for the Deputy Attorney General who prosecuted Burton's case. Since the suspension was imposed in connection with the Deputy Attorney General's comments and actions in a case completely unrelated to Burton's case, *See In re Gelof*, 142 A.3d 506 (Table), 2016 WL 3419111 (Del. June 10, 2016), the 2016 professional disciplinary decision cited by Burton is completely irrelevant to the issue presented here.

In addition, the applicable standard of review for factual determinations made in the state courts under § 2254(d)(2) is whether the state court's factual finding was incorrect in light of the

20

evidence presented **at the time of the relevant state court adjudication** which, in this case, consisted of the evidentiary hearings in Burton's second Rule 61 proceeding. *See* 28 U.S.C. 2254(d)(2)(emphasis added); *Titlow*, 134 S.Ct. at 15; *Roundtree v. Balicki*, 640 F.3d 530, 537-38 (3d Cir. 2011)(explaining that a "federal court measures the reasonableness of the state court's factual findings [against] the record evidence at the time of the state court's adjudication.") As such, the disciplinary decision is irrelevant because it was not available for consideration at the time of the August 2015 and September 2015 evidentiary hearings in Burton's second Rule 61 proceeding. For all of these reasons, it was reasonable for the Delaware Supreme Court to rely on the Superior Court's court credibility determinations and on its determination that there was no tacit agreement between C.B. and the State.

Finally, even if what occurred in Burton's collateral proceeding should or could enter into the habeas calculation, and even if there had been a tacit agreement, the court would still not grant relief for claim three. In order for a prosecutorial misconduct claim to warrant federal habeas relief, the prosecutor's actions must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 180 (1986). A prosecutorial misconduct claim must be examined in "light of the record as a whole" in order to determine whether the conduct "had a substantial and injurious effect or influence" on the jury's verdict. *Brecht v. Abramson*, 507 U.S. 619, 638 (1993). Pursuant to Third Circuit precedent, this inquiry involves examining "the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant." *Moore v. Morton*, 255 F.3d 95 (3d Cir. 2001). Simply alleging misconduct fails to establish a violation of due process because

the focus of the *Darden* inquiry is the unfairness of the trial, not the conduct of the prosecutor. *See Smith v. Phillips*, 455 U.S. 209, 219 (1982).

Here, Burton has failed to demonstrate that the existence of any alleged tacit agreement rendered the January 2014 evidentiary hearing and/or the Superior Court's denial of his second Rule 61 motion unfair. The Superior Court's determination that C.B.'s recantation was not reliable was based on its conclusion that C.B. was not credible for a number of reasons independent of the existence or non-existence of a tacit agreement. *See Burton*, 2014 WL 54568874, at *4-5. Moreover, C.B. did not disclaim her 2010 recantation at the January 2014 hearing. Her testimony at the hearing was not consistent with her trial testimony and, on balance, actually helped Burton rather than the State. Thus, the court cannot conclude that the State's alleged tacit agreement prejudicially affected Burton's substantial rights.

Accordingly, the court will deny claim three.

## IV.    CERTIFICATE OF APPEALABILITY

When a district court issues a final order denying a § 2254 petition, the court must also decide whether to issue a certificate of appealability. *See* 3d Cir. L.A.R. 22.2 (2011). A certificate of appealability is appropriate when a petitioner makes a "substantial showing of the denial of a constitutional right" by demonstrating "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

The court has concluded that Burton's petition fails to warrant federal habeas relief. The court is persuaded that reasonable jurists would not find this conclusion to be debatable. Therefore, the court will not issue a certificate of appealability.

22

## V.    CONCLUSION

For the reasons stated, Burton's petition for habeas relief pursuant to 28 U.S.C. § 2254 is denied without an evidentiary hearing or the issuance of a certificate of appealability.  An appropriate order shall issue.

23